PRIEST, Appellant,

v.

TFH–EB, INC., d.b.a. Electra Bore, Inc., Appellee.

[Cite as *Priest v. TFH–EB, Inc.* (1998), 127 Ohio App.3d 159.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 97APE08–1051.

Decided March 31, 1998.

160

*William J. O'Malley*, for appellant.

*Moore, Yaklevich & Mauger, W. Jeffrey Moore* and *Jud R. Mauger*, for appellee.

PEGGY BRYANT, Judge.

Plaintiff-appellant, Cameron Priest, appeals from a judgment of the Franklin County Court of Common Pleas granting a directed verdict on her claims for sex discrimination and intentional infliction of emotional distress.

On July 23, 1993, plaintiff filed a complaint against defendant-appellee, TFH–EB, Inc., d.b.a. Electra Bore, Inc., charging defendant with (1) sex discrimination, (2) wrongful discharge due to breach of an implied contract and promissory estoppel, and (3) intentional and negligent infliction of emotional distress. Pursuant to defendant's summary judgment motion, the trial court on January 26, 1995, granted defendant summary judgment on plaintiff's claim for negligent infliction of emotional distress but denied defendant's motion in all other respects.

Although plaintiff prior to trial dismissed her claim based on breach of implied contract and promissory estoppel, she presented evidence concerning the remaining counts of her complaint. At the close of plaintiff's case, the trial court granted defendant's motion for directed verdict on plaintiff's claim for intentional infliction of emotional distress but denied defendant's motion concerning plaintiff's claim of sex discrimination. At the close of all the evidence, however, the trial court granted defendant's directed verdict motion on plaintiff's sex discrimination claim.

Plaintiff appeals, assigning the following errors:

"I. The common pleas court committed reversible error when it granted defendant's motion for directed verdict on plaintiff's claim for pregnancy discrimination.

"II. The common pleas court committed reversible error when it granted defendant's motion for directed verdict on plaintiff's claim for intentional infliction of emotional distress."

Both of plaintiff's assigned errors challenge the trial court's granting of defendant's motions for directed verdict. "A directed verdict is proper when, after construing the evidence most strongly in favor of the nonmoving party, the court determines that the trier of fact could reach only one result under the theories of law presented in the complaint." *Huffer v. Cicero* (1995), 107 Ohio App.3d 65, 72, 667 N.E.2d 1031, 1035, citing *Grau v. Kleinschmidt* (1987), 31 Ohio St.3d 84, 90, 31 OBR 250, 255, 509 N.E.2d 399, 404. Because a motion for directed verdict tests the legal sufficiency of the evidence, the trial court may not weigh the evidence or try the credibility of witnesses, but must give the party opposing the motion the benefit of all reasonable inferences from the evidence. *Cummings v. B.F. Goodrich Co.* (1993), 86 Ohio App.3d 176, 186–187, 620 N.E.2d 209, 215–216, cause dismissed in part (1993), 66 Ohio St.3d 1471, 611 N.E.2d 328, jurisdictional motion overruled (1993), 66 Ohio St.3d 1510, 613 N.E.2d 1048; *Atkinson v. Internatl. Technegroup, Inc.* (1995), 106 Ohio App.3d 349, 666 N.E.2d 257, appeal not allowed (1996), 74 Ohio St.3d 1525, 660 N.E.2d 744. Thus, if plaintiff presented substantial, competent evidence, which, if believed, would permit reasonable minds to come to different conclusions on her claims, the trial

court was required to submit the issue to the jury and to deny defendant's motion for directed verdict. *Wagner v. Roche Laboratories* (1996), 77 Ohio St.3d 116, 671 N.E.2d 252; *Weidner v. Blazic* (1994), 98 Ohio App.3d 321, 648 N.E.2d 565.

According to plaintiff's evidence, on January 28, 1991, plaintiff was placed through a temporary job placement agency in a temporary position with defendant as a secretary/administrative assistant, including overflow office duties and basic accounting. She was to work with defendant for approximately six weeks as a temporary; if defendant was pleased with her performance, it could offer her a permanent position.

Plaintiff remained an employee of the temporary placement agency during her temporary position with defendant. Defendant, however, through its employee Betsy Solt, approached plaintiff one day and stated that "we have been watching your work. You're doing a real good job." She offered plaintiff a permanent position with defendant. Defendant was aware at the time that plaintiff was pregnant, but advised that the pregnancy "should not have an effect on your permanent position."

Plaintiff was concerned about her pregnancy because she had two previous miscarriages in the prior year. Her concern was aggravated by the very heavy smoking environment at defendant's workplace. Prompted by her concern, plaintiff and a co-worker, Mary Hall, spoke to Solt, requesting a no-smoking sign in their area and perhaps a fan to blow the smoke out of the area. According to plaintiff, Solt advised that "all you can really do is just open the window." Because the weather did not permit plaintiff to have an open window, Solt's suggestion did not resolve the problem. Solt did not authorize plaintiff to get a fan.

Plaintiff decided to contact OSHA about the smoking problem. After her conversation, however, she decided not to pursue action through OSHA for fear of upsetting defendant. Instead, she decided to contact her obstetrician, from whom she requested a letter asking defendant to provide plaintiff a fan and a no-smoking sign due to the dangerous effects of second-hand smoke on plaintiff's pregnancy. Plaintiff's doctor prepared a letter dated March 21, 1991, which plaintiff gave to Solt, who said she would give it to Thomas Havens, the chairman of the board of Electra Bore. Havens did not verbally respond to the letter, but according to plaintiff he "did approach my desk, and as I looked up he deliberately blew smoke into my face and ashes were dumped on my desk." Very upset by Haven's actions, plaintiff "went to the bathroom, got myself back together." She then called her husband and told him to go ahead and call OSHA.

Defendant ultimately was sent a copy of an OSHA complaint. As a result, Havens stormed out of his office and threw the letter on plaintiff's desk. Plaintiff "was very, very upset. I thought for sure he was going to fire me over this."

She immediately called her husband, who, with plaintiff, met with Havens and Solt on April 2, 1991. At the meeting, Havens said he was upset over the letter, which he deemed "unnecessary." Havens further said, "[P]ersonally, if it was my wife and I was concerned about a hazardous work condition, she wouldn't be working here." He added that "Cammie was doing a great job." Indeed, according to plaintiff, up until the time she called OSHA she had received no written reprimands and no verbal counselling. Defendant always stated to her that she "was doing a great job and they were happy."

Havens later approached plaintiff with a letter and stated that plaintiff needed to sign it. When she indicated she might like to think about it, he became very serious and upset and said that it had to be signed at that time. The document indicated that defendant had taken steps to correct the smoking problem of which plaintiff had complained. Plaintiff signed it because she felt she would be fired on the spot if she did not.

Defendant terminated plaintiff on April 17, 1991. During the time period between her April 2 meeting and her termination, plaintiff asserts that she was not provided any written discipline, nor was she told that her performance was inadequate or unsatisfactory.

Plaintiff's first assignment of error asserts that the trial court erred in granting a directed verdict at the close of all the evidence on plaintiff's claim of sex discrimination.

R.C. 4112.02(A) provides that it is an unlawful discriminatory practice for any employer "because of the * * * sex * * * of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." R.C. 4112.01(B) states that for the purposes of "divisions (A) to (F) of section 4112.02 of the Revised Code, the terms 'because of sex' and 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy * * *." R.C. 4112.01(B) further provides that "[w]omen affected by pregnancy * * * shall be treated the *same* for all employment-related purposes * * * as other persons not so affected but similar in their ability or inability to work * * *." (Emphasis added.)

■ "[F]ederal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000(e) *et seq.,* Title 42, U.S.Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112." *Joint Apprenticeship Plumbers ·& Steamfitters Commt. v. Ohio Civ. Rights Comm.* (1981), 66 Ohio St.2d 192, 196, 20 O.O.3d 200, 202, 421 N.E.2d 128, 131. Federal case law is especially relevant here, since R.C. 4112.01(B) reads almost the same as the Pregnancy Discrimination Act ("PDA"), which amended Title VII by expressly prohibiting

discrimination on account of pregnancy. See Section 2000e(k), Title 42, U.S.Code.

In her complaint, plaintiff premised her pregnancy-discrimination claim on defendant's failure to accommodate her request to lessen the amount of tobacco smoke in her work area. Similarly, in her argument in opposition to defendant's motion for a directed verdict at the close of her case, plaintiff argued:

"In short, in this case, we have shown that my client was pregnant; the employer knew she was pregnant. She complained about the smoking environment, how she was worried about her pregnancy; no action was taken; she brought this to OSHA's attention.

"When OSHA responded, the employer got very angry, demanded to—wanted to know, were you responsible for this? We know you have been complaining about the smoking, stormed out of there. When she complained about it to her doctor, brought the doctor's note in, Mr. Havens came in, blew smoke in her face, only response was two weeks after the OSHA complaint, my client's fired.

"There, in an[d] of itself, is enough of an inference of discrimination to make the defendant go forward and articulate some legitimate reason for its action."

Plaintiff's allegations and argument, however, misconstrue federal and Ohio law to the extent that she argues that defendant engaged in pregnancy discrimination by refusing to accommodate her request. Federal law simply requires employers to treat pregnant employees the same as similarly situated nonpregnant employees; it does not create substantive rights to preferential treatment. *Deneen v. Northwest Airlines, Inc.* (C.A.8, 1998), 132 F.3d 431, 436, quoting *Lang v. Star Herald* (C.A.8, 1997), 107 F.3d 1308, 1312; *Armstrong v. Flowers Hosp., Inc.* (C.A.11, 1994), 33 F.3d 1308, 1316–1317. Thus, the PDA does not require an employer to make accommodations for its pregnant employees unless it has made accommodations to similarly situated nonpregnant employees. *Deneen, supra,* at 437–438; *Troupe v. May Dept. Stores Co.* (C.A.7, 1994), 20 F.3d 734, 738. "The PDA does not require an employer to overlook the work restrictions of pregnant women unless the employer overlooks the comparable work restrictions of other employees." *Deneen, supra,* at 437.

Ohio courts implicitly, as in *Frank v. Toledo Hosp.* (1992), 84 Ohio App.3d 610, 617 N.E.2d 774, and expressly as in *Frazier v. The Practice Mgt. Resource Group, Inc.* (June 27, 1995), Franklin App. No. 95APE01–46, unreported, 1995 WL 390792, discretionary appeal not allowed (1995), 74 Ohio St.3d 1446, 656 N.E.2d 347, recognize that an employer need not accommodate pregnant women to the extent that such accommodation amounts to preferential treatment. Accordingly, to prevail on her pregnancy discrimination claim, plaintiff must show

that defendant treated her differently because of her pregnancy. *Deneen, supra,* 132 F.3d at 435; *Geier v. Medtronic, Inc.* (C.A.7, 1996), 99 F.3d 238, 241.

Of the several theories available to plaintiffs seeking to prove pregnancy discrimination, plaintiff initially attempted to prove a case of disparate treatment under the general formula that the United States Supreme Court employed in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 802–805, 93 S.Ct. 1817, 1824–1826, 36 L.Ed.2d 668, 677–679. Under that formula, the plaintiff has the burden of establishing a prima facie case of disparate treatment. Once the prima facie case is met, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas, supra,* at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 678. Finally, "should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Dept. of Community Affairs v. Burdine* (1981), 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207, 215. See, also, *Sutherland v. Nationwide Gen. Ins. Co.* (1994), 96 Ohio App.3d 793, 645 N.E.2d 1338; cf. *St. Mary's Honor Ctr. v. Hicks* (1993), 509 U.S. 502, 510, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407, 418.

To establish a prima facie case of discrimination under the *McDonnell Douglas* framework as modified to fit the allegations in this case, plaintiff had to present evidence sufficient to support a finding that (1) she was a member of the protected class, (2) she was qualified for her position, (3) she was discharged, and (4) a comparable non-protected employee was treated more favorably. Here, the parties do not dispute the first and third prongs of the prima facie case. Plaintiff was a member of the protected class by virtue of her pregnancy and she was discharged from employment.

The second prong of the prima facie case concerning plaintiff's qualifications was seriously disputed, as was much of plaintiff's evidence generally, including plaintiff's contention that Havens blew smoke in plaintiff's face and dumped ashes on her desk. For purposes of defendant's directed verdict motion, however, the evidence must be construed in plaintiff's favor. Given plaintiff's testimony that she received no verbal or written reprimand for her work, but instead was told that she was doing a good job, plaintiff presented sufficient evidence to establish the second prong of her prima facie case.

Under the fourth prong, plaintiff rightly contended in the trial court at the close of her evidence that she did not have to prove that she was replaced by a person not of the protected class. Both the Ohio and federal statutory provisions expressly provide that "[w]omen affected by pregnancy * * * shall be treated the *same* for all employment-related purposes * * * as other persons not

so affected but similar in their ability or inability to work * * *." R.C. 4112.01(B); Section 2000e(k), Title 42, U.S.Code. Thus, generally the relevant inquiry in pregnancy discrimination cases arising under either the Ohio or federal statute is whether an employer treats a pregnant employee differently because of her pregnancy. *Deneen, supra,* 132 F.3d at 436–438; *Frank, supra,* 84 Ohio App.3d at 615, 617 N.E.2d at 777–778.

Although plaintiff attempted to prove that she was treated differently than a comparable employee, Mary Hall, the trial court properly found that plaintiff failed to show disparate treatment. While Hall worked in the same area as plaintiff and joined plaintiff in requesting a no-smoking sign and a fan, she did not pursue the matter after Solt advised plaintiff to open a window. Had defendant terminated plaintiff's employment immediately following her request for a sign and fan, Hall, who was not discharged from employment, would have been a comparable non-protected employee treated more favorably than plaintiff. Defendant, however, did not terminate plaintiff's employment until after receiving the letter from plaintiff's doctor and the complaint filed by OSHA. Whether or not these facts give rise to a "whistleblower" claim concerning workplace conditions, a claim not alleged in this case, they do not give rise to a pregnancy-discrimination claim because plaintiff failed to show that a comparable nonpregnant employee was treated more favorably.

At the close of defendant's case, however, plaintiff argued that she had set forth evidence meeting the fourth prong of the *McDonnell Douglas* test because, even if she failed to show that a comparable employee had been treated more favorably, she had shown that defendant replaced her with a non-pregnant employee.

While Ohio courts often employ the "comparable employee" analysis for the fourth prong of the *McDonnell Douglas* test in pregnancy discrimination cases, at least one Ohio court has used the "replacement" analysis to determine whether the prima facie test was met. See *Frantz v. Beechmont Pet Hosp.* (1996), 117 Ohio App.3d 351, 690 N.E.2d 897. The factual differences between *Frantz* and plaintiff's allegations illustrate why the replacement test is inappropriate here.

Here, plaintiff does not assert that she was discharged from employment simply because she was pregnant; she asserts that she was discharged because she complained about the smoke conditions in the environment as they related to her pregnancy. Given those allegations, plaintiff's proving that she was replaced by a nonpregnant employee does not necessarily give rise to the inference that she was discharged because of her pregnancy.

Specifically, absent plaintiff's actions regarding the smoke environment, plaintiff's replacement with a nonpregnant employee would suggest discrimination if

she were performing her work adequately, as required under the prima facie case; logic would suggest that her pregnancy was the cause of her discharge, at least until the employer sets forth a viable explanation disputing the inferred cause for discharge. By contrast, plaintiff not only was pregnant, but by her own actions injected the issue of smoke conditions into her employment, the very reason she says she was discharged. Her replacement by a nonpregnant employee suggests two possible inferences: discharge due to pregnancy or due to her smoke-environment complaints that the employer had no duty under R.C. Chapter 4112 to remedy. Because two possible inferences arise, the replacement test fails to isolate, or imply, pregnancy as the basis for defendant's terminating plaintiff's employment. In contrast, the comparable-employee test, which requires inquiry into how defendant responded to smoke-related complaints from nonpregnant employees, isolates the issue of whether plaintiff's pregnancy was the basis for discharge from employment.

Plaintiff having failed to establish a prima facie case of discrimination, the trial court properly granted defendant's directed verdict motion on her claim of pregnancy discrimination. Plaintiff's first assignment of error is overruled.

Plaintiff's second assignment of error asserts that the trial court erred in granting defendant's directed verdict motion on her claim for intentional infliction of emotional distress.

■ A claim for intentional infliction of emotional distress requires that plaintiff show that (1) defendant intended to cause emotional distress, or knew or should have known that actions taken would result in serious emotional distress, (2) defendant's conduct was extreme and outrageous, and (3) defendant's actions proximately caused plaintiff's emotional distress. *Phung v. Waste Mgt., Inc.* (1994), 71 Ohio St.3d 408, 644 N.E.2d 286.

■ Here, plaintiff asserts that Havens's action in blowing smoke in plaintiff's face and dumping ashes on her desk, knowing that she was pregnant, is outrageous conduct that warrants sending plaintiff's claim of intentional infliction of emotional distress to the jury for resolution. Even if, however, we find that Havens's conduct meets the test set forth in *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, 375, 6 OBR 421, 426, 453 N.E.2d 666, 671, in that it was so extreme and outrageous "as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community," plaintiff still must prove that Havens's actions caused her serious emotional distress.

In that respect, plaintiff testified that she was upset by Havens's actions and resorted to the restroom, where she could get herself back together. She said that it was "very humiliating and it was like someone had spit on me. It was

degrading and it was just unbelievable someone could do this to me, not only, me but my unborn child." While plaintiff's reaction to Havens's alleged action is understandable, nothing in her testimony suggests that Haven's actions produced serious emotional distress. Nor did she present the testimony of any mental health professional who could speak to that element of her case. Given the absence of evidence supporting that element of plaintiff's claim for intentional infliction of emotional distress, the trial court did not err in granting a directed verdict on that aspect of plaintiff's case. Accordingly, plaintiff's second assignment of error is overruled.

Having overruled plaintiff's first and second assignments of error, we affirm the judgment of the trial court.

*Judgment affirmed.*

DESHLER, P.J., and JOHN C. YOUNG, J., concur.